# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1334

CHRISTINE B. COLLINS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CV 2958—**John W. Darrah**, *Judge*.

ARGUED SEPTEMBER 19, 2008—DECIDED MAY 1, 2009

Before POSNER, RIPPLE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.    In 2000, two small planes collided while approaching the Waukegan Regional Airport, which is near Lake Michigan north of Chicago, and crashed into a medical center. The planes' occupants—the pilot and passenger of one, the student pilot of the other—were killed, and the medical center was damaged. When the collision occurred, one plane was approaching the airport, intending to land, and the other plane, the one piloted by the student pilot, was

practicing takeoffs and landings and also intending to land. The airport's control tower had no radar, so that in clearing planes to take off or land the air traffic controller on duty in the tower had to rely on what he could see from the tower and on what the pilots told him by radio were their positions. The controller was employed by Midwest Air Traffic Control Services, a contractor hired by the Federal Aviation Administration to provide air traffic control at the Waukegan airport. The collision occurred because he could not see either plane and the pilot of the first plane misreported his position, leading the controller to believe that the planes were at a safe distance from each other; and so he cleared them to land. A contributing factor was that one plane was flying slightly higher than the other, and the wings of the higher plane were below the plane's fuselage and the wings of the lower plane above its fuselage, so that the pilots could not see each other. Glare from the sun, and ground clutter (the complex pattern formed by buildings and other features of the ground, which makes it difficult for a pilot, looking down, to see a plane flying beneath him), were other contributing factors.

A flurry of suits arising from the accident were brought in both state and federal court. All eventually were settled except the one before us, which was brought against the United States under the Federal Tort Claims Act by the representatives of the three persons who were killed. The district judge, after a bench trial, entered judgment for the United States.

The Act grants the federal courts jurisdiction over suits for damages against the United States "for injury or

loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). (That place, in this case, is Illinois.) An employee of the government includes "employees of any federal agency," such as the Federal Aviation Administration, but excludes "any contractor with the United States." § 2671. Midwest Air Traffic Control Services is a contractor, and the district judge ruled that although the FAA exercises close supervision over the companies to which it contracts out air traffic control, the supervision is not close enough to render controllers employed by those companies employees of the United States. So though he found that the air traffic controller on duty the day of the accident had been negligent in clearing the planes to land when he could not see them, the judge refused to impute that negligence to the United States.

The plaintiffs also contended that the FAA had been negligent in failing to install radar at the Waukegan airport. But this ground of liability, the judge ruled, was blocked because the act "shall not apply to any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a federal agency . . . whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Before we can consider the merits of the appeal, we must address the government's contention that the

district court lost subject-matter jurisdiction over the case when on the eve of trial Midwest settled the plaintiffs' claims against it. Under Illinois law, a principal whose liability is based on the doctrine of respondeat superior, which is Midwest's situation, cannot be sued if the agent whose negligence is imputed to the principal by that doctrine—in this case the air traffic controller who was on duty when the collision occurred—settles with the plaintiff. *Gilbert v. Sycamore Municipal Hospital*, 622 N.E.2d 788, 797 (Ill. 1993); *Doe v. City of Chicago*, 360 F.3d 667, 673 (7th Cir. 2004) (Illinois law); *J&J Timber Co. v. Broome*, 932 So. 2d 1, 7-8 (Miss. 2006); *Restatement (Third) of Torts: Apportionment of Liability* § 16, comment d and illustration 2 (2000); contra, *Harris v. Miller*, 438 S.E.2d 731, 741-42 (N.C. 1994). The reason is that the principal in such a case has a common law right to be indemnified by his agent. *Washington Gaslight Co. v. District of Columbia*, 161 U.S. 316, 328 (1896); *Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 446 (7th Cir. 1986); *Stawasz v. Aetna Ins. Co.*, 240 N.E.2d 702, 703-04 (Ill. App. 1968). That right arose as an exception to the traditional common law rule rejecting contribution among joint tortfeasors—that if the plaintiff sued and obtained a judgment against just one of the joint tortfeasors, that one could not sue to force the others to help pay the judgment. *Northwest Airlines v. Transportation Workers Union*, 451 U.S. 77, 86 (1981); *Donovan v. Robbins*, 752 F.2d 1170, 1178-79 (7th Cir. 1985); Dan B. Dobbs, *The Law of Torts* § 386, pp. 1078-80 (2000). The traditional rule has been abrogated in most jurisdictions in favor of contribution, but indemnity retains significance because it shifts the entire loss to the tortfeasor held to

have a duty to indemnify, rather than sharing out the loss among the tortfeasors.

The reason for this shifting, in the case in which an employer's liability is based on the doctrine of respondeat superior, is that the employee is in a better position than his employer to avoid inflicting the injury that incited the suit against the employer. Allowing the employer to shift the full financial responsibility for the employee's negligence to the employee increases the latter's incentive to take care, and his care is crucial because if he takes due care, an accident will be averted that the employer might not have been able to avert.

But the right of indemnity makes a settlement by the employee with the tort plaintiff illusory if the employer remains liable to the plaintiff. Midwest settled with the plaintiffs for less than a million dollars. The plaintiffs' aggregate injury was much greater, which is why they are suing the United States despite the settlement with Midwest. If (a big if, as we're about to see), Midwest is deemed the "employee" of the United States, then, were it not for the rule that extinguishes the principal's liability when the agent settles, Midwest would be faced with the prospect of a suit for indemnity by the United States should the plaintiffs obtain damages in their tort claims suit. If the suit succeeded, Midwest would have gained nothing from settling with the United States' agent.

The parties to the settlement with Midwest seem to have been aware of the rule that a settlement with the agent discharges the principal, because they stated in the settlement agreement that the agreement was not a set-

tlement. But it *was*, because in exchange for a payment by Midwest the plaintiffs relinquished their claim against Midwest. That's what a settlement is, regardless of what the parties call it. But the rule discharging the principal has no proper application here because the government, when it is held liable under the Federal Tort Claims Act, has no right of indemnity from its negligent employee. *United States v. Gilman*, 347 U.S. 507, 508-10 (1954); Gregory C. Sisk, *Litigation with the Federal Government* § 3.04(e), pp. 122-23 (4th ed. 2006); see also *Munson v. United States*, 380 F.2d 976, 978 (6th Cir. 1967); *Restatement (Second) of Torts* § 895D, comment j (1979). Indeed, because the Westfall Act, 28 U.S.C. § 2679(b)(1), forbids bringing a suit against a federal employee for committing a "negligent or wrongful act or omission . . . while acting within the scope of his office or employment," the government has made itself exclusively liable for such torts, and by doing so, it can be argued, has determined that the employee should bear no liability himself, including the indirect liability that the doctrine of indemnity would create. See Sisk, *supra*, at 123.

Granted, Midwest, the settling party, was not an employee of the United States, even if the errant air traffic controller is deemed to have been one. But the government would have no right of indemnity (unless as a matter of contract, which has not been suggested) against Midwest even if Midwest were deemed an employee of the United States. For remember that the right to be indemnified is based on the difference between direct and vicarious liability—the liability of a person who commits a tortious act versus the liability of his employer just by virtue of

being his employer. Midwest's liability arises from its being the employer of the air traffic controller. Its liability, like that of the United States, is vicarious. The symmetry of the two defendants' positions defeats the government's appeal to the indemnity rule, which is based on the superior ability of the agent who commits the tort to have avoided committing it by the exercise of due care, compared to his employer, who is liable for the tort only by virtue of being the original tortfeasor's employer. The parties could of course by contract impose a duty of indemnity in such a case, *Restatement (Third) of Agency* § 3.15, comment d and illustration 9 (2006), but remember that there is no suggestion of such a contractual provision in this case. The doctrine applicable here is "tort indemnity," imposed by law rather than by contract, perhaps to soften the rigors of the old rule denying a right of contribution among joint tortfeasors. *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 718-19 (2d Cir. 1978) (Friendly, J.); see also *Araujo v. Woods Hole*, 693 F.2d 1, 2 (1st Cir. 1982); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 51, pp. 341-42 (5th ed. 1984).

Even if the government were right that the settlement with Midwest had discharged the government's liability to the plaintiffs, it would be wrong to insist, as it did with some vehemence at the oral argument, that it is an issue of jurisdictional moment. The government's lawyer further argued that the rules in the Tort Claims Act itself that bar government liability when either the original tortfeasor is an independent contractor, rather than an employee, or the government's act is shielded by the discretionary-function exception to liability, are also

jurisdictional. This would mean that even if the government failed to raise any of these defenses, the district court and this court (and the Supreme Court, if the case went that far) would be obliged to consider it. (Inconsistently, the government asks us merely to affirm the district court's decision, which was a decision on the merits, not a decision dismissing the case for want of jurisdiction.)

The government was repeating arguments that we had rejected emphatically in *United States v. Cook County*, 167 F.3d 381 (7th Cir. 1999), and more recently in *Parrott v. United States*, 536 F.3d 629, 634-35 (7th Cir. 2008); see also *Palay v. United States*, 349 F.3d 418, 424 (7th Cir. 2003). Now it is true that ours is a minority position, see *Loughlin v. United States*, 393 F.3d 155, 162-63 (D.C. Cir. 2004); *Williams v. United States*, 50 F.3d 299, 304-05 (4th Cir. 1995); *Fazi v. United States*, 935 F.2d 535, 539 (2d Cir. 1991); *Feyers v. United States*, 749 F.2d 1222, 1225-26 (6th Cir. 1984), and it is also true that our opinion in *Palay* acknowledges some wavering in our own cases. 349 F.3d at 424. But the cases that hold that defenses to the government's liability under the Tort Claims Act are jurisdictional do not so much analyze the issue as treat it as an automatic corollary of the Act's constituting a waiver of the federal government's sovereign immunity from suit. We cannot see what that has to do with jurisdiction. Because of its sovereign immunity, the federal government does not have to allow people to sue it. But almost all statutes that create a right to sue are matters of grace, in the sense that the legislature was not required to enact the statute under which the plaintiff is suing. "[W]hat sovereign immunity means is

that relief against the United States depends on a statute; the question is not the competence of the court to render a binding judgment, but the propriety of interpreting a given statute to allow particular relief." *United States v. Cook, supra*, 167 F.3d at 389.

A court has subject-matter jurisdiction if it has the "authority to decide the case either way." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) (Holmes, J.); see also *Heitmann v. City of Chicago*, 2009 WL 764155, at *2 (7th Cir. Mar. 25, 2009); *Kircher v. Putnam Funds Trust*, 373 F.3d 847 (7th Cir. 2004); *Ricketts v. Midwest National Bank*, 874 F.2d 1177, 1181 (7th Cir. 1989). The term is thus reserved "for prescriptions delineating the classes of cases . . . within a court's adjudicatory authority." *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). (This emphatic recent restatement by the Supreme Court of the principle of *The Fair v. Kohler Die & Specialty Co.* may prompt a rethinking by the courts that have declined to apply the principle to federal tort claims cases.)

Thus, "to say that Congress has authorized the federal courts to decide a class of disputes is to say that subject-matter jurisdiction is present." *United States v. T & W Edmier Corp.*, 465 F.3d 764, 765 (7th Cir. 2006). Obviously the federal courts are authorized to decide suits under the Federal Tort Claims Act; indeed, no other court system is. 28 U.S.C. § 1346(b)(1).

We turn at last to the merits, where there are two issues. The first is whether the FAA exerted enough control over Midwest's air controllers to make them de facto federal employees. This issue was recently addressed in

a nearly identical case, involving another midair collision to which the negligence of an air traffic controller employed by Midwest was alleged to have contributed. We held that, extensive though the control of the FAA over its contract controllers is, they are not its employees. *Alinsky v. United States*, 415 F.3d 639 (7th Cir. 2005). We decline to revisit that decision.

The second issue is the applicability to this case of the discretionary-function exception to the liability of the federal government for tort claims. TARDIS, an acronym for "Terminal Automated Radar Display Information System," is an inexpensive radar system designed for air traffic control. Although it has not been certified by the FAA because it hasn't undergone the stringent tests for accuracy required for certification, we'll assume that had the control tower at the Waukegan Regional Airport been equipped with TARDIS the collision would have been averted. The FAA, partly because of doubts about TARDIS's accuracy and partly because it preferred to finance other radar-system projects, decided not to try to equip VFR ("visual flight rules"—that is, not radar-equipped) airports, such as the Waukegan Regional Airport, cheap as TARDIS was (though just how cheap is unclear from the record—the range of estimates is $20,000 to $100,000), even though other radar systems were not yet available in 2000.

In making decisions on equipment allocation for airports, the FAA considers a variety of factors, including the volume of air traffic at the airport, the variety of aircraft that use the airport, terrain and climate, cost, of course,

and, related to cost, competing needs for the agency's limited funds. At the time of the accident, only eight airports had TARDIS. The district judge thought the FAA had been negligent in failing to install TARDIS at the Waukegan airport because of the danger of collisions at an airport from which planes piloted by student pilots are taking off and landing, and the horrendous consequences of a collision. Even so, he was right that the FAA's negligence was shielded from liability by the discretionary-function exception.

The prioritization of demands for government money is quintessentially a discretionary function. *United States v. Varig Airlines*, 467 U.S. 797, 819-20 (1984); *Cope v. Scott*, 45 F.3d 445, 450-51 (D.C. Cir. 1995); *Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995); *Pennbank v. United States*, 779 F.2d 175, 180 (3d Cir. 1985) ("a decision regarding the allocation of federal funds is a discretionary function which goes to the heart of governmental activity"). The FAA must allocate its limited funds among competing radar systems, between radar systems and other safety methods, and between safety measures and measures for improving other dimensions of air traffic control, such as reducing the delays caused by crowded skies. The agency might prioritize so unreasonably that its decision could be adjudged negligent, but the Tort Claims Act is explicit that once a decision is classified as an exercise of discretion, the fact that the discretion was abused or even not exercised at all is irrelevant.

Which is why it is irrelevant that some of the VFR airports that received TARDIS were ones in which mem-

bers of Congress had asked the FAA to install the system and others were ones in which the only reason for the installation appears to have been that there had been a collision, regardless of the risk of future collisions. It may not be right in some moral sense, but it is certainly an example of discretionary decision making, for a federal agency to give weight to requests from members of Congress, and also to shut the barn door after the horses have escaped. The first point is obvious, the second only slightly less so. If there has been a collision at an airport, a radar system is not installed in the wake of the collision, and then there is another collision, the FAA will receive searing criticism even if it can show that the first collision really wasn't predictive of future collisions at that airport.

Against this reasoning the plaintiffs cite *United States v. Gaubert*, 499 U.S. 315, 325 n. 7 (1991), where the Supreme Court said that "there are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." Similarly, "if the employee violates [a] mandatory regula-tion, there will be no shelter from liability because there

is no room for choice and the action will be contrary to policy." *Id*. at 324. The plaintiffs reason from this language that the FAA is not protected by the discretionary-function exception in the present case because prioritizing in response to congressional pressures and the occurrence of a previous collision does not further the purposes of the regulatory regime.

The plaintiffs are overreading *Gaubert*. It is true that if a statute or regulation or other directive intended to be binding forbids the specific act contended to have been negligent, the employee who committed the act was not exercising authorized discretion. *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008). And likewise if his exercise of discretion had no policy content. Suppose a federal food inspector, while driving to a meat-processing plant that he is required to inspect, decides to run a red light because he fears that if he stops abruptly the car behind him will hit him and he doesn't see another car approaching the intersection. But he is mistaken and the cars collide (and his car is also hit from the rear, anyway). He made a conscious choice to run the light and so was exercising discretion, but it was an exercise unrelated to the formulation and implementation of the Federal Food, Drug, and Cosmetic Act. Invoking the discretionary-function defense in such a case would not serve its intended purpose of protecting the discretionary *policy-related* decisions of federal officers from being second-guessed by judges. But the decision to install TARDIS at some airports but not others, the others including the Waukegan airport, was a discretionary policy judgment, whether or not we think the FAA should allow itself to be

influenced by congressional or public opinion, cf. *United States v. Gaubert*, *supra*, 499 U.S. at 322-23; *Miller v. United States*, 163 F.3d 591, 593-94 (9th Cir. 1998), and it was therefore behind the liability shield. *Alinsky v. United States*, *supra*, 415 F.3d at 648.

AFFIRMED.